STEPHEN G. LARSON (SBN 145225)
*slarson@larsonllp.com*
HILARY POTASHNER (SBN 167060)
*hpotashner@larsonllp.com*
A. ALEXANDER LOWDER (SBN 269362)
*alowder@larsonllp.com*
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone:  (213) 436-4888
Facsimile:  (213) 623-2000

Attorneys for Defendants
SCUDERIA DEVELOPMENT, LLC,
1001 DOUBLEDAY, LLC,
VON KARMAN – MAIN STREET, LLC, and
10681 PRODUCTION AVENUE, LLC

ROBERT F. RUYAK (*Pro Hac Vice*)
*robertr@ruyakcherian.com*
**RUYAK CHERIAN LLP**
1901 L St. NW, Suite 700
Washington, DC 20036
Telephone:  (202) 838-1560

Attorneys for Defendants
PERFECTUS ALUMINIUM INC.,
aka "Perfectus Aluminum Inc." and
PERFECTUS ALUMINUM ACQUISITIONS LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:19-CR-00282-RGK |
| Plaintiff, | *The Honorable R. Gary Klausner* |
| vs. | **NOTICE OF JOINT MOTION AND JOINT MOTION TO DISMISS INDICTMENT (FED. R. CRIM. P. 12(b))** |
| ZHONGTIAN LIU, aka "Liu Zhongtian," aka "Chairman," aka "Uncle Liu," aka "UL," aka "Big Boss," CHINA ZHONGWANG HOLDINGS LIMITED, aka "ZW," aka "Mother Ship," | Hearing Date:   July 19, 2021 Hearing Time:   1:30 p.m. Courtroom:   850 |

1  ZHAOHUA CHEN,
       aka "Chen Zhaohua,"
2       aka "Uncle Chen,"
   XIANG CHUN SHAO,
3       aka "Johnson Shao,"
   PERFECTUS ALUMINUM INC.,
4       aka "Perfectus Aluminum Inc.,"
   PERFECTUS ALUMINUM
5  ACQUISITIONS, LLC,
   SCUDERIA DEVELOPMENT, LLC,
6  1001 DOUBLEDAY, LLC,
   VON KARMAN – MAIN STREET,
7  LLC, and
   10681 PRODUCTION AVENUE, LLC,
8
          Defendants.
9

10

11        **TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF**

12  **RECORD:**

13        **PLEASE TAKE NOTICE** that Defendants Scuderia Development, LLC,

14  1001 Doubleday, LLC, Von Karman-Main Street, LLC, and 10681 Production

15  Avenue, LLC, (collectively, the " Warehouse Defendants"), and Defendants

16  Perfectus Aluminum Inc. and Perfectus Aluminum Acquisitions, LLC, (collectively,

17  the "Perfectus Defendants") by and through their attorneys of record, on July 19,

18  2021, at 1:30 p.m. or as soon thereafter as the matter may be heard, will and hereby

19  do move this Court to dismiss the Indictment filed by the government on May 7,

20  2019 (ECF No. 1) pursuant to Federal Rule of Criminal Procedure 12(b).

21

22

23

24

25

26

27

28

1     This motion is based upon this Notice, the attached Memorandum of Points

2  and Authorities, all other papers and records filed in this matter, and any other

3  argument or evidence that may presented at or in connection with the hearing on this

4  motion.

5

6  Dated:  June 14, 2021          Respectfully submitted,

7                                 LARSON LLP

8

9                                 By:  _____/s/ Stephen G. Larson_____
                                       Stephen G. Larson
10                                      Hilary Potashner
                                        A. Alexander Lowder
11
                                   Attorneys for Defendants
12                                 SCUDERIA DEVELOPMENT, LLC,
                                   1001 DOUBLEDAY, LLC,
13                                 VON KARMAN – MAIN STREET, LLC, and
                                   10681 PRODUCTION AVENUE, LLC
14
                                   RUYAK CHERIAN LLP
15

16
                                   By:  _____/s/ Robert F. Ruyak_____
17                                      Robert F. Ruyak

18                                 Attorneys for Defendants
                                   PERFECTUS ALUMINIUM INC.,
19                                 aka "Perfectus Aluminum Inc." and
                                   PERFECTUS ALUMINUM ACQUISITIONS
20                                 LLC

21

22

23

24

25

26

27

28

1

TABLE OF CONTENTS

2    I.      INTRODUCTION ..................................................................................8

3    II.      RELEVANT ALLEGATIONS IN THE INDICTMENT .................................8

4      A. The Co-Defendants Charged with Wire Fraud.....................................8

5      B. The Warehouse Defendants.............................................................10

6    III.    LEGAL STANDARD .........................................................................10

7    IV.    ARGUMENT....................................................................................11

8      A. The Wire Fraud Counts (Counts 2 through 10) Should Be Dismissed
       Because the Government Cannot Overcome the Presumption Against

9        Extraterritoriality ............................................................................11

10        1. The Wire Fraud Statute Has No Extraterritorial Application .....................12

11        2. The Indictment Does Not Involve a Permissible Domestic Application
         of the Wire Fraud Statute..............................................................13

12

13          a.     The Alleged Scheme Involves Primarily Foreign Conduct Directed
           at Foreign Individuals and Entities ......................................14

14          b.     The Alleged Domestic Wires Were Merely Incidental to the Foreign
           Conduct.......................................................................15

15

16      B. The Passing False and Fraudulent Papers through Customhouse Counts
       (Counts 11 through 17) Should Be Dismissed Because the Aluminum

17        at Issue Was Not Subject to the AD/CVD Duties as a Matter of Law............16

18      C. The AD/CVD Orders Do Not Establish a Valid Property Right for Purposes
       of the Conspiracy Count (Count One)..............................................18

19      D. The Conspiracy Count (Count One) and International Promotional Money
       Laundering Counts (Counts 18 through 24) Should Be Dismissed Because

20        the Indictment Fails to Adequately Allege Wire Fraud or Passing False
       and Fraudulent Papers through Customhouse .................................22

21    V.      CONCLUSION................................................................................23

22

23

24

25

26

27

28

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**Federal Cases**

5

*ArcelorMittal USA LLC v. United States*,
6
   302 F. Supp. 3d 1366 (Ct. Int'l Trade 2018) ...................................................... 17

7

*Bascunan v. Elsaca*,
8
   927 F.3d 108 (2d Cir. 2019) ............................................................................ 14, 15

9

*Cleveland v. United States*,
10
   531 U.S. 12 (2000) ........................................................................................ 18, 19, 20

11

*Kelly v. United States*,
   140 S. Ct. 1565 (2020) ................................................................................. 18, 19, 20

12

*Kiobel v. Royal Dutch Petroleum Co.*,
13
   569 U.S. 108 (2013) .......................................................................................... 12

14

*Laydon v. Mizuho Bank, Ltd.*,
15
   2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015) ................................................... 15

16

*Microsoft Corp. v. AT & T Corp.*,
17
   550 U.S. 437 (2007) .......................................................................................... 12

18

*Norex Petroleum Ltd. v. Access Industries, Inc.*,
19
   631 F.3d 29 (2nd Cir. 2010) ............................................................................ 14

20

*NSK Ltd. v. United States*,
   115 F.3d 965 (Fed. Cir. 1997) ......................................................................... 17

21

*Pasquantino v. United States*,
22
   544 U.S. 349 (2005) ....................................................................................... 20, 21

23

*Petroleos Mexicanos v. SK Engineering & Const. Co. Ltd.*,
24
   572 F. App'x 60 (2d Cir. 2014) ....................................................................... 15

25

*RJR Nabisco, Inc. v. European Cmty.*,
26
   136 S. Ct. 2090 (2016) ................................................................................... 12, 13

27

*Russell v. United States*,
28
   369 U.S. 749 (1962) .......................................................................................... 11

*SKF USA Inc. v. United States*,
　118 F.Supp.2d 1315 (Ct. Int'l Trade 2000) ......................................................... 17

*Smith v. United States*,
　507 U.S. 197 (1993) ............................................................................................. 12

*United States v. Berger*,
　473 F.3d 1080 (9th Cir. 2007) ............................................................................. 11

*United States v. Chesney*,
　10 F.3d 641 (9th Cir. 1993) ................................................................................. 11

*United States v. D'Alessio*,
　822 F. Supp. 1134 (D.N.J. 1993) ........................................................................ 23

*United States v. Griffin*,
　324 F.3d 330 (5th Cir. 2003) ............................................................................... 20

*United States v. Hussain*,
　972 F.3d 1138 (9th Cir. 2020) ....................................................................... 13, 14

*United States v. McLellan*,
　959 F.3d 442 (1st Cir. 2020) ............................................................................... 14

*United States v. Miller*,
　953 F.3d 1095 (9th Cir. 2020) ............................................................................. 18

*United States v. Napout*,
　963 F.3d 163 (2d Cir. 2020) .......................................................................... 14, 15

*United States v. Nukida*,
　8 F.3d 665 (9th Cir. 1993) .............................................................................. 10, 11

*United States v. Prevezon Holdings Ltd.*,
　122 F. Supp. 3d 57 (S.D.N.Y. 2015) .................................................................. 15

*United States v. Sidorenko*,
　102 F. Supp. 1124 (N.D. Cal. 2015)......................................................... 12, 13, 15

*Zenith Electronics Corp. v. United States*,
　99 F.3d 1576 (Fed. Cir. 1996) ............................................................................ 16

**Federal Statutes**

18 U.S.C.
    § 545 ..........................................................................................................22
    § 1343 .............................................................................................11, 18, 22
    § 1956(a)(2)(A)...........................................................................................22

19 U.S.C.
    § 1671(a) ....................................................................................................16
    § 1673 ........................................................................................................17
    § 1673(1)....................................................................................................16

**Other Authorities**

Rule 12(b) of the Federal Rules of Criminal Procedure.........................................10

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Defendants Scuderia Development, LLC, 1001 Doubleday, LLC, Von Karman – Main Street, LLC, and 10681 Production Avenue, LLC (collectively, the "Warehouse Defendants") and defendants Perfectus Aluminum Inc. and Perfectus Aluminum Acquisitions, LLC, (collectively, the "Perfectus Defendants") move to dismiss Counts Two through Ten, which allege wire fraud, on the grounds that the government is violating the presumption against extraterritoriality by improperly seeking to apply United States criminal laws to conduct carried out primarily in a foreign jurisdiction and directed at foreign investors.  Similarly, the Warehouse Defendants and the Perfectus Defendants move to dismiss Counts Eleven through Seventeen because they are rooted in conduct—the importation of aluminum pallets—which is not alleged to have impacted the United States commerce market and therefore could not implicate the customs laws defendants are charged with violating.  Finally, the conspiracy count, Count One, and the international money laundering counts, Counts Eighteen through Twenty-Four (which only name the Perfectus Defendants), should also be dismissed because they fail to allege valid predicate offenses in support of those counts.

Due to these fundamental and fatal flaws in the Indictment, the Warehouse Defendants and the Perfectus Defendants respectfully request that the Court dismiss the Indictment in its entirety as to them.

## II.    RELEVANT ALLEGATIONS IN THE INDICTMENT[1]

### A.    The Co-Defendants Charged with Wire Fraud

Defendant China Zhongwang was a Chinese aluminum company headquartered in Liaoyang City, Liaoning Province, in the People's Republic of

---

[1]    Defendants hereby summarize the allegations contained in the Indictment as is required for purposes of this motion.  Should the Court decline to grant this

1    China.  (Indictment, at ¶ 3.)  On or about May 8, 2009, shares of China Zhongwang

2    were listed on the Main Board of the Stock Exchange of Hong Kong Limited

3    ("HK Stock Exchange") through an initial public offering.  *Id.* ¶ 5.  The HK Stock

4    Exchange required China Zhongwang to publish annual financial reports to disclose

5    information on the operations and financial performance of China Zhongwang,

6    including information about revenue, cost of sales, gross profit, assets, and

7    liabilities.  *Id.* ¶ 6.

8         China Zhongwang was a subsidiary of its parent company defendant

9    Zhongwang International Group Limited ("ZIGL").  *Id.* ¶ 1.  ZIGL was owned by

10   defendant Zhongtian Liu ("Liu"), a citizen of the People's Republic of China.

11   *Id.* ¶¶ 1-2.  Through his ownership of ZIGL, Liu was the controlling shareholder of

12   China Zhongwang.  *Id.* ¶ 2.  Liu served as President of China Zhongwang from

13   May 2009 through March 2016 and as Chairman of the Board of Directors from

14   May 2009 until his resignation in November 2017.  *Id.*  Defendant Zhaohua Chen, a

15   resident of the People's Republic of China and Hong Kong, was a close friend of

16   Liu who apparently worked for ZIGL and its related entities.  *Id.* ¶ 9.

17        Defendant Xiang Chun Shao ("Shao") was a resident of California.  *Id.* ¶ 10.

18   From 2008 through 2014, Shao, at the direction of Liu, managed certain entities

19   incorporated in California between January 2004 and August 2010.  *Id.* ¶ 11.

20   Among those entities were Pengcheng Aluminum Enterprise, Inc. ("PCA") and

21   Transport Aluminum, Inc. ("TCI").  *Id.*  On or about July 28, 2006, a bank account

22   ending in 9191 in the name of PCA was opened at Cathay Bank in the City of

23   Industry, California ("PCA Account").  *Id.* ¶ 13.  Four years later, on or about

24   August 26, 2011, a bank account ending in 2058 in the name of TCI was opened at

25   the same bank ("TCI Account").  *Id.* ¶ 14.  On or about December 4, 2014,

26   _____

27   motion in whole or in part, Defendants reserve the right to contest all remaining
     charges and allegations at trial.

28

1  defendant Perfectus Aluminum, Inc. ("Perfectus") was incorporated in California

2  with its principal office located in Ontario, California. *Id.* ¶ 15. In or about 2016,

3  Shao was appointed as a manager of Perfectus.

4      **B.**   **The Warehouse Defendants**

5      On or about October 22, 2007, defendant Scuderia Development, LLC was

6  formed in Delaware. *Id.* ¶ 19. On or about October 28, 2014, Scuderia purchased a

7  600,000 square foot warehouse located at 14600 Innovation Drive, Riverside,

8  California. *Id.* On or about October 27, 2008, defendant 1001 Doubleday, LLC

9  purchased a 394,000 square foot warehouse located at 1001 South Doubleday

10 Avenue, Ontario, California. *Id.* ¶ 20. On or about October 31, 2009, defendant

11 Von Karman – Main Street, LLC purchased a 260,000 square foot warehouse

12 located at 2323 Main Street, Irvine, California. *Id.* ¶ 21. On or about September 11,

13 2009, defendant 10681 Production Avenue, LLC purchased a 1,100,000 square foot

14 warehouse located at 10681 Production Avenue, Fontana, California. *Id.* ¶ 22. The

15 Indictment alleges that defendant Liu effectively owned and controlled the

16 Warehouse Defendants. *Id.* ¶¶ 19-22. At the direction of Liu, Warehouse

17 Defendants would stockpile and cause to be stockpiled the alleged aluminum

18 extrusions in the form of pallets at the warehouses. *Id.* ¶ 32(j).

19 **III.**   **LEGAL STANDARD**

20     Rule 12(b) of the Federal Rules of Criminal Procedure allows the

21 consideration at the pretrial stage of any defense "which is capable of determination

22 without the trial of the general issue." *United States v. Nukida*, 8 F.3d 665, 669

23 (9th Cir. 1993). A motion to dismiss is generally "capable of determination" before

24 trial if it involves questions of law rather than fact. *Id.* An indictment must set forth

25 the elements in order "to inform the court of the facts alleged, so that it may decide

26 whether they are sufficient in law to support a conviction, if one should be had."

27 *Russell v. United States*, 369 U.S. 749, 768 (1962); *United States v. Chesney*,

28 10 F.3d 641, 643 (9th Cir. 1993) ("An indictment's failure to state an element of the

1  charged offense is a fundamental defect.").  When considering a motion to dismiss,

2  the indictment "should be read in its entirety, construed according to common sense,

3  and interpreted to include facts which are necessarily implied."  *United States v.*

4  *Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007).

5  **IV.   <u>ARGUMENT</u>**

6      **A.   <u>The Wire Fraud Counts (Counts 2 through 10) Should Be</u>**

7          **<u>Dismissed Because the Government Cannot Overcome the</u>**

8          **<u>Presumption Against Extraterritoriality</u>**

9         The Indictment alleges that the defendants were involved in a scheme to

10  defraud foreign investors in defendant China Zhongwang as to material matters, and

11  to obtain money from such investors by means of material false and fraudulent

12  pretenses, representations, and promises.  (Indictment, at ¶ 36.)  In essence, the

13  "scheme to defraud" alleges classic securities fraud: That defendants fraudulently

14  induced foreign investors to purchase and hold shares of China Zhongwang from the

15  HK Stock Exchange by falsely inflating China Zhongwang's value, sales revenue,

16  and volume of exports.  *See id*. ¶ 33(a)(i).

17         While the government would ordinarily charge the scheme alleged in the

18  Indictment as "securities fraud" under Section 10(b), *Morrison v. Nat'l Australia*

19  *Bank Ltd*. bars the government from doing so.  *See Morrison*, 561 U.S. 247 (2010)

20  (holding Section 10(b) does not apply extraterritorially to allow foreign investors to

21  recover losses from purchases on foreign securities exchanges from foreign issuers)

22  ("*Morrison*").  Therefore, the government seeks to utilize the wire fraud statute, 18

23  U.S.C. § 1343, to bring these alleged *foreign* securities violation charges within the

24  purview of United States criminal law.  The Supreme Court, however, has made

25  clear, recognizing long established international norms of sovereignty and comity,

26  that "United States law governs *domestically* but does not rule the world."

27  *Microsoft Corp. v. AT & T Corp*., 550 U.S. 437, 454 (2007) (emphasis added).

28

1        The presumption against extraterritoriality should prevent the government

2   from pleading around *Morrison* and seeking to overextend the reach of the wire

3   fraud statute to protect foreign investors in a foreign company that purchased shares

4   on a foreign stock exchange.  *See Kiobel v. Royal Dutch Petroleum Co*., 569 U.S.

5   108, 116 (2013) ("the presumption against extraterritorial application helps ensure

6   that the [j]udiciary does not erroneously adopt an interpretation of U.S. law that

7   carries foreign policy consequences not clearly intended by the political branches").

8   The government's invocation of the wire fraud statute in this case also runs afoul of

9   the "commonsense notion that Congress generally legislates with domestic concerns

10  in mind."  *Smith v. United States*, 507 U.S. 197, 204, n. 5 (1993).

11       Following *Morrison*, the leading case on extraterritorially, courts have

12  adopted a two-step analysis to determine whether a United States statute applies

13  extraterritorially.  *First*, in light of the presumption against extraterritoriality, a court

14  must examine whether a statute gives an otherwise "clear indication of

15  extraterritorial application."  *Morrison*, 561 U.S. at 255.  If so, the statute may

16  properly be applied to the foreign conduct at issue.  If not, the court must proceed to

17  the second step, evaluating whether the indictment involves a "permissible domestic

18  application" of the statute.  *See RJR Nabisco, Inc. v. European Cmty*., 136 S. Ct.

19  2090, 2100 (2016).

20             1.   <u>The Wire Fraud Statute Has No Extraterritorial Application</u>

21       Here, the first step of the *Morrison*'s analysis does not favor extraterritorial

22  application of the wire fraud statute, as there is no language in the statute itself

23  authorizing such a reach.  *See United States v. Sidorenko*, 102 F. Supp. 1124, 1129

24  (N.D. Cal. 2015) (finding that, "[b]ecause there is no clear indication of

25  extraterritorial intent" in the wire fraud statute, it has no extraterritorial application).

26  This is true even though the wire fraud statute includes the phrase "foreign

27  commerce."  *Id.*; *see also Morrison*, 561 U.S. at 262-63 (holding that "even statutes

28

1  that contain a broad language in their definitions of 'commerce' that expressly refer

2  to 'foreign commerce' do not apply abroad.")

3        2.    The Indictment Does Not Involve a Permissible Domestic

4                Application of the Wire Fraud Statute

5        Moving to the second step of the *Morrison* analysis, the allegations in the

6  indictment do not involve a permissible domestic application of the wire fraud

7  statute.  Where, as is the case here, "the conduct relevant to the [statute's] focus

8  occurred in a foreign country, [] the case involves an impermissible extraterritorial

9  application regardless of any other conduct that occurred in U.S. territory."

10  *RJR Nabisco*, 136 S. Ct. at 2101.  In *United States v. Hussain*, the Ninth Circuit

11  recently held that the "focus" of the wire fraud statute is "the use of wires in

12  furtherance of a scheme to defraud."  *United States v. Hussain*, 972 F.3d 1138, 1145

13  (9th Cir. 2020).  The court then held that "[s]o long as [defendant's] use of the wires

14  in furtherance of his fraud had a sufficient domestic nexus," the wire fraud charges

15  constitute a permissible domestic application of the statute.  *Id.*  While the Ninth

16  Circuit upheld the defendant's fourteen wire fraud convictions, the facts supporting

17  a finding of a "sufficient domestic nexus" in *Hussain* are critically distinguishable

18  from the allegations before this Court.

19        In *Hussain*, the defendant, the Chief Financial Officer of a United Kingdom

20  technology company, was charged and convicted, with employing domestic wires in

21  furtherance of a scheme to defraud a domestic victim, Hewlett Packard ("HP").

22  *Hussain*, 972 F.3d at 1141.  The court determined that "each count of wire fraud

23  involved the use of a domestic wire," thereby concluding that the wire fraud

24  convictions were a domestic application of the wire fraud statute.  *Id.* at 1145.

25  However, because the scheme targeted a domestic victim, the Ninth Circuit declined

26  to address whether the use of domestic wires was merely "incidental to the overall

27  scheme."  *Id.* at 1144, n. 2.  Here, unlike in *Hussain*, the government does not

28  identify a single domestic victim to justify a domestic application of the statute.

1                       a.      <u>The Alleged Scheme Involves Primarily Foreign Conduct</u>

2                                <u>Directed at Foreign Individuals and Entities</u>

3         The Indictment alleges that defendants defrauded foreign investors in

4 defendant China Zhongwang.  (Indictment, at ¶¶ 36, 37, 38.)  "[I]n order for

5 incidental domestic wire transmissions not to haul essentially foreign allegedly

6 fraudulent behavior into American courts, "the use of the ... wires must be essential,

7 rather than merely incidental, to the scheme to defraud."  *United States v. Napout*,

8 963 F.3d 163, 179 (2d Cir. 2020); *Bascunan v. Elsaca*, 927 F.3d 108, 122 (2d Cir.

9 2019) (citing *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138

10 (2018)) (same); *United States v. McLellan*, 959 F.3d 442, 470, n. 7 (1st Cir. 2020)

11 (holding additional inquiry necessary where a foreign defendant is alleged to have

12 committed wire fraud against a foreign victim, and the use of domestic wires was

13 merely "incidental" to the overall scheme); *Hussain*, 972 F.3d at 1143 (citing

14 *Napout*, *Bascunan* and *McLellan*).  "[S]imply alleging that some domestic conduct

15 occurred cannot support a claim of domestic application."  *Norex Petroleum Ltd. v.*

16 *Access Industries, Inc.*, 631 F.3d 29, 33 (2nd Cir. 2010).  Here, because the domestic

17 wires were "incidental" to the alleged foreign scheme, they are not a sufficient

18 nexus to support the wire fraud charges.

19         Specifically, the Indictment alleges that defendants, by way of alleged

20 misrepresentations made in a foreign jurisdiction, fraudulently induced investors to

21 purchase and hold shares of defendant China Zhongwang by: (i) falsely inflating the

22 value of China Zhongwang at the time the IPO issued in the HK Stock Exchange

23 through false representations; (ii) falsely inflating the sales revenue of China

24 Zhongwang; and (iii) falsely inflating the volume of China Zhongwang's exports *to*

25 the United States.  (Indictment, ¶ 33(a)(i).)  All this conduct is alleged to have

26 occurred and to involve entities and individuals, exclusively, in the People's

27 Republic of China or Hong Kong.

28

1       b.     The Alleged Domestic Wires Were Merely Incidental to

2              the Foreign Conduct

3          Promoting this sprawling wire fraud theory, the government asks this Court to

4   spend "scarce federal resources" to "police foreign individuals" and "foreign

5   organizations" on "matters completely unrelated to the United States," *see*

6   *Sidorenko*, 102 F. Supp. 3d at 1132, based on: *one* email sent from China to the

7   United States (Count Two); *one* email sent from the United States to China (Count

8   Eight); *two* bank transfers from the United States *to* Hong Kong (Counts Three,

9   Six); and *five* bank transfers from the United States *to* the People's Republic of

10  China (Counts Four, Five, Seven, Nine, Ten).  These charged wires were hardly the

11  "core component of the scheme to defraud" the foreign investors in defendant China

12  Zhongwang.  *See Bascunan*, 927 F.3d at 122.  Nothing about the two emails asking

13  for payment of aluminum (Count Two) and requesting funds for rent and operational

14  expenses (Count Eight) were critical to the scheme's success.

15         Here, the seven charged bank transfers are the domestic tail wagging the

16  foreign dog—conduct merely incidental, rather than essential, to the alleged scheme

17  to defraud.  *Napout*, 963 F.3d at 179; *Petroleos Mexicanos v. SK Engineering &*

18  *Const. Co. Ltd.*, 572 F. App'x 60, 61 (2d Cir. 2014) ("The activities involved in the

19  alleged scheme—falsifying the invoices, the bribes, the approval of the false

20  invoices—took place outside of the United States.  The allegations of domestic

21  conduct are simply insufficient.]"); *United States v. Prevezon Holdings Ltd.*,

22  122 F. Supp. 3d 57, 70-72 (S.D.N.Y. 2015) (scheme where foreign defendants

23  obtained financing in the United States, transmitted multiple false invoices for

24  $159 million through New York, and paid bribes from New York trust was

25  extraterritorial); *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515487, at *8 (S.D.N.Y.

26  Mar. 31, 2015) (rejecting application of wire fraud statute when allegations were

27  "far too attenuated to sufficiently plead that the scheme to defraud came about in the

28  U.S.").  Accordingly, because the wire fraud charges constitute an extraterritorial

1  application of United States criminal law, the Warehouse Defendants and the

2  Perfectus Defendants respectfully request that the Court dismiss Counts Two

3  through Ten against them.

4       **B.**     <u>**The Passing False and Fraudulent Papers through Customhouse**</u>

5             <u>**Counts (Counts 11 through 17) Should Be Dismissed Because the**</u>

6             <u>**Aluminum at Issue Was Not Subject to the AD/CVD Duties as a**</u>

7             <u>**Matter of Law**</u>

8       Counts Eleven through Seventeen are fatally defective because the Indictment

9  does not provide a sufficient basis to charge the defendants with evading, or seeking

10  to evade, customs duties through the importation of aluminum extrusions as pallets.

11  (*See* Indictment ¶¶ 32, 40, and 42.)  Simply put, the Indictment concedes that the

12  harm the AD/CVD duties were intended to address did not occur; no aluminum

13  extrusions were ever sold in the United States after the imposition of the AD/CVD

14  orders – none.  Thus, based on the four corners of the Indictment, no injury was

15  intended or realized as a result of the conduct alleged in the Indictment.

16       Antidumping duties target "imported products being sold, or likely to be sold,

17  at less than their fair value to the harm of a domestic industry."[2]  *Zenith Electronics*

18  *Corp. v. United States*, 99 F.3d 1576, 1577 (Fed. Cir. 1996); 19 U.S.C. § 1673(1).

19  Likewise, countervailing duties target subsidized products "imported, or sold (or

20  likely to be sold) for importation into the United States" that cause or threaten injury

21  to an industry in the United States.  19 U.S.C. § 1671(a). When determining the

22  amount of a duty, products that are not sold are not to be included in the calculation.

23  *See NSK Ltd. v. United States*, 115 F.3d 965, 973 (Fed. Cir. 1997); *see SKF USA*

24  *Inc. v. United States*, 118 F.Supp.2d 1315, 1319 (Ct. Int'l Trade 2000) ("the

25

26  ---

[2]   Indeed, the Indictment alleges that anti-dumping duties are intended to "counter

27      international price discrimination that caused injury to United States domestic

28      industries."  (Indictment, ¶ 26.)

1  distribution of [products] for no consideration falls outside the purview of 19 U.S.C.

2  § 1673.").  In this context, an exporter's sale price is the "price at which

3  merchandise is *sold* or agreed to be *sold* in the United States."  *NSK*, 115 F.3d at 969

4  (quoting 19 U.S.C. § 1677a) (emphasis added); *see also ArcelorMittal USA LLC v.*

5  *United States*, 302 F. Supp. 3d 1366, 1370 (Ct. Int'l Trade 2018) (holding the date

6  of *sale* defines the universe of sales that are subject to Commerce's determination of

7  anti-dumping duties).  Because products that are not sold in the United States are not

8  included in the duty calculation, the act of importing extrusions welded into the

9  form of aluminum pallets, with no intention of selling them as extrusions in the

10  United States, is not within the purview of the antidumping / countervailing duty

11  laws.

12       Even accepting the allegations contained in the Indictment as true,

13  defendants' conduct did not implicate the AD/CVD duties.  The aluminum imported

14  as part of the alleged scheme were never sold in the United States, and are not

15  alleged to have been broken down into extrusions for distribution in the U.S. market.

16  Indeed, the Indictment alleges, repeatedly, that the aluminum pallets were stockpiled

17  in warehouses and never sold.  (Indictment, ¶ 33(h) ("there were no customers for

18  these aluminum pallets . . . . none of these pallets was ever sold"); *id*. ¶ 33(j) ("By

19  stockpiling and causing to be stockpiled the aluminum extrusions in the form of

20  pallets . . ."); *id*. at Overt Act No. 33 ("PCA had not sold any of the aluminum

21  pallets PCA had previously imported.")).  These plain factual allegations defeat the

22  Indictment's conclusory allegation that defendants schemed to harm the United

23  States.  Simply put, the anti-dumping and countervailing duty laws are not directed

24  at products that are not being sold, or intended for sale, in the United States.

25       Accordingly, because Counts Eleven through Seventeen are predicated on

26  conduct that *as alleged* does not implicate the antidumping or countervailing duty

27  laws, the government has failed to allege any material misrepresentations on

28  customs papers.  As such, these counts are fatally deficient and should be dismissed.

C.    **The AD/CVD Orders Do Not Establish a Valid Property Right for Purposes of the Conspiracy Count (Count One)**

The wire fraud statute requires the government to show that the Warehouse Defendants deprived the United States of "money or property" by means of deception.  *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (citing *Shaw v. United States*, 137 S. Ct. 462, 469 (2016)).  In Count One, the Indictment alleges, *inter alia*, that the defendants conspired to commit offenses against the United States, including wire fraud in violation of Title 18, United States Code, Section 1343 by fraudulently concealing from the United States the applicability of the AD/CVD Orders to the pallets being imported.  (Indictment, ¶ 32(a).)  This allegation on its face does not amount to deprivation of a "money or property" right.

The Supreme Court decisions in *Cleveland v. United States*, 531 U.S. 12 (2000) and *Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) are instructive on this point.  In *Cleveland*, the Supreme Court reversed convictions for conspiracy to commit mail fraud based on false statements made in applications for video poker licenses submitted to the State of Louisiana because such licenses were not "property" within the meaning of the mail fraud statute.  *Cleveland*, 531 U.S. at 18. In doing so, the Supreme Court made clear that regulatory interests, such as the rights to allocation, exclusion, and control, did not constitute "property" as required under federal fraud statutes because the licenses did not constitute "property in the hands of the victim."  *Id.* at 15, 20–22.  Instead, the Court concluded that "[e]ven when tied to an expected stream of revenue, the State's right of control does not create a property interest any more than a law licensing liquor sales in a State that levies a sales tax on liquor. Such regulations are paradigmatic exercises of the States' traditional police powers."  *Id.* at 23.

Relying heavily on *Cleveland*, the Supreme Court in *Kelly* held that the right to control access to the bridge was simply a regulatory choice and thus not "property" within the meaning of the property fraud statutes.  The defendants did

1  not "walk away with the lanes, nor did they take the lanes from the [Port Authority]

2  by converting them to a non-public use." *Kelly*, 140 S. Ct. at 1573. Instead, the

3  defendants "exercised" for themselves the Port Authority's "regulatory rights of

4  allocation, exclusion, and control," thereby "alter[ing] a regulatory decision about

5  the toll plaza's use." *Id.* Although the evidence demonstrated defendants'

6  wrongdoing, *i.e.*, deception, corruption, etc., under *Cleveland*, "that run-of-the-mine

7  exercise of regulatory power," the Court held, "cannot count as the taking of

8  property." *Id.* Recognizing that the Port Authority had a property interest in its

9  employees' time and labor and that the defendants had "used" the time and labor of

10  those employees to "implement[]" their scheme, the Court further held that federal

11  laws are only violated if the object of the defendants' conduct was to "obtain the

12  Port Authority's money or property[.]" *Id.* at 1573-74. While the scheme had as a

13  completely foreseeable byproduct the use of employees' valuable time and labor in

14  implementing relocation of the lanes, the "object" of the defendants scheme was

15  "never to get the employees' labor," but rather to "impede access from Fort Lee to

16  the George Washington Bridge." *Id.* As such, the conduct did not violate the wire

17  fraud statute.

18      Here, the government's property right theory is based on the United States

19  Department of Commerce ("DOC") and the United States International Trade

20  Commission's ("USITC") right to impose AD/CVD duties on aluminum extrusions

21  imported from the People's Republic of China. (Indictment, ¶¶ 26, 27, 28.) Under

22  *Cleveland* and *Kelly*, the right to impose AD/CVD duties are not "property" under

23  the wire fraud statute because this right is purely regulatory. The Indictment alleges

24  that AD/CVD duties are imposed "to ensure fair competition between United States

25  companies and foreign industry, and to counter international price discrimination

26  that caused injury to United States domestic industries." *Id.* ¶ 26. In this regard, the

27  AD/CVD duties are like the video poker licenses in *Cleveland* because the duties

28  implicate the DOC and USITC's rights to allocation, exclusion, and control of

1    imported goods into the United States.  Accordingly, like the false statements made

2    in the applications in *Cleveland*, submitting false statements in Form 7501 to United

3    States Customs and Border Protection ("CBP") is not a chargeable offense of wire

4    fraud.

5           Moreover, as in *Kelly*, the alleged scheme to defraud the  CBP does not fall

6    within the wire fraud statute because the object of the wire fraud was not to obtain

7    the CBP's money or property.  Rather, like the scheme to impede access to the

8    bridge in *Kelly*, the Indictment here alleges a scheme to "evade" the imposition of

9    AD/CVD duties by falsely identifying the aluminum pallets as finished merchandise

10   in Form 7501 and stockpiling the aluminum to "prevent the CBP from discovering

11   the it was extrusions subject to AD/CVD duties."  (Indictment, ¶¶ 33(x)-(cc).)

12          In fact, the Indictment makes clear that the AD/CVD duties had never

13   actually been imposed by the CBP, only that defendants "were able to evade paying

14   approximately $1.8 billion in AD/CVD duties."  *Id.* ¶ 33(aa); *see also United States*

15   *v. Griffin*, 324 F.3d 330, 354–55 (5th Cir. 2003) (unissued tax credits do not amount

16   to economic property as contemplated by section 1341 while they are in the state's

17   possession because the only property interest the state has in the tax credits is purely

18   abstract or theoretical until the tax credits have actually been issued).  While the

19   government will likely argue that the Warehouse Defendants' defense is at odds

20   with *Pasquantino v. United States*, 544 U.S. 349 (2005), the fact that the AD/CVD

21   duties had not actually been imposed makes *Pasquantino* materially distinguishable.

22          In *Pasquantino*, the defendants were convicted of federal wire fraud for

23   carrying out a scheme to smuggle large quantities of liquor into Canada from the

24   United States by driving the liquor over the Canada border while avoiding taxes by

25   hiding the liquor in their vehicles and failing to declare the goods to Canadian

26   customs.  *Pasquantino*, 544 U.S. at 353.  There, it was uncontested that Canadian

27   taxes then due on alcohol purchased in the United States and transported to Canada

28   equaled approximately double the liquor's purchase price.  *Id.*  Upholding the wire

fraud convictions, the Supreme Court held that the "property" element was based on Canada's right to uncollected excise taxes on the liquor petitioners imported into Canada. *Id.* The *Pasquantino* court reasoned that "[h]ad [defendants] *complied with this legal obligation*, they would have paid money to Canada … The object of petitioners' scheme was to deprive Canada of money *legally due*, and their scheme thereby had as its object the deprivation of Canada's "property." *Id.* at 356–57 (emphasis added).

Unlike *Pasquantino*, the defendants did not hide the importation of the aluminum pallets from the CBP or fail to declare the aluminum pallets. As the Indictment alleges, the defendants would submit Form 7501, declaring that the aluminum pallets were not subject to the 2011 AD/CVD Orders (*see e.g.,* Indictment, Overt Act Nos. 27, 28), and the pallets were subject to inspection by United States Customs at the time of entry. Thus, unlike *Pasquantino*, the defendants did comply with their legal obligations to report the aluminum pallets to the CBP. Moreover, there was no dispute as to whether the alcohol in *Pasquantino* was taxable at the time it was smuggled into Canada. Here, the Indictment simply speculates that defendants were obligated to pay the AD/CVD duties and indicates that the CBP has yet to conclusively make this determination. As such, unlike *Pasquantino*, the Indictment does not establish that the AD/CVD duties were "legally due" at the time the aluminum pallets were imported to the United States.

Accordingly, the failure to pay the AD/CVD duties cannot support be utilized to support Count One.

**D.** **The Conspiracy Count (Count One) and International Promotional Money Laundering Counts (Counts 18 through 24) Should Be Dismissed Because the Indictment Fails to Adequately Allege Wire Fraud or Passing False and Fraudulent Papers through Customhouse**

Count One alleges conspiracy to commit wire fraud, passing false and fraudulent papers through customhouse, and international promotional money laundering as the predicates. (Indictment, ¶ 32.) Count One should be dismissed, because as discussed above, the Indictment, fails to adequately plead violations of either the wire fraud statute or of the customs fraud statute. *See, supra*, Sections IV.A and B. While the Indictment alleges two separate predicates for wire fraud— defrauding the United States (Count One) and defrauding foreign investors (Counts Two through Ten), the Indictment fails to adequately allege either theory. *Id.* Furthermore, as to Counts Eighteen through Twenty-Four, charging international promotional money laundering, the Indictment fails to adequately plead that offense as to the Perfectus Defendants.

To establish international promotional money laundering under 18 U.S.C. § 1956(a)(2)(A), the government must demonstrate that defendants transmitted, transported or transferred a monetary instrument or funds from a place in the United States to or through a place outside the United States "with the intent to promote the carrying on of specified unlawful activity." *See* 18 U.S.C. § 1956(a)(2)(A). Here, the Indictment alleges the "specified unlawful activity" as wire fraud (18 U.S.C. § 1343) and customs fraud (18 U.S.C. § 545) to support Counts Eighteen through Twenty-Four. (Indictment, ¶ 42.) However, as detailed above, the Indictment fails to allege facts to support a conviction for wire fraud or for customs fraud.

Therefore, because the Indictment does not support violations for wire fraud or for customs fraud—*i.e.*, the "specified unlawful activity" element of promotional money laundering—Counts Eighteen through Twenty-Four are fatally defective,

should be dismissed, and cannot form the basis Count One.  *See, e.g., United States v. D'Alessio*, 822 F. Supp. 1134, 1146 (D.N.J. 1993) ("[a]ccording to the indictment, the specified unlawful activity is the alleged mail fraud charged in counts one through three.  Since counts one through three have been dismissed, there is no basis upon which to support the money laundering charges in counts four and five, and therefore, they must be dismissed as well.").

## V.   CONCLUSION

For these reasons, the Warehouse Defendants and the Perfectus Defendants respectfully request that the Court dismiss the Indictment, in its entirety, with prejudice.

Dated:  June 14, 2021

Respectfully submitted,

LARSON LLP

By:   _/s/ Stephen G. Larson_
Stephen G. Larson
Hilary Potashner
A. Alexander Lowder

Attorneys for Defendants
SCUDERIA DEVELOPMENT, LLC,
1001 DOUBLEDAY, LLC,
VON KARMAN – MAIN STREET, LLC, and
10681 PRODUCTION AVENUE, LLC

RUYAK CHERIAN LLP

By:   _/s/ Robert F. Ruyak_
Robert F. Ruyak

Attorneys for Defendants
PERFECTUS ALUMINIUM INC.,
aka "Perfectus Aluminum Inc." and
PERFECTUS ALUMINUM ACQUISITIONS
LLC