1  Stephen G. Larson (SBN 145225)
   slarson@larsonllp.com
2  Hilary Potashner (SBN 167060)
   hpotashner@larsonllp.com
3  A. Alexander Lowder (SBN 269362)
   alowder@larsonllp.com
4  **LARSON LLP**
   555 South Flower Street, Suite 4400
5  Los Angeles, California 90071
   Telephone:  (213) 436-4888
6  Facsimile:   (213) 623-2000

7  Attorneys for Defendants
   SCUDERIA DEVELOPMENT, LLC,
8  1001 DOUBLEDAY, LLC,
   VON KARMAN - MAIN STREET, LLC,
9  and 10681 PRODUCTION AVENUE,
   LLC
10
   ROBERT F. RUYAK *(Pro Hac Vice)*
11 robertr@ruyakcherian.com
   **RUYAKCHERIAN LLP**
12 1901 L Street NW, Suite 700
   Washington, DC  20036
13 Telephone:  202-838-1560

14 Attorneys for Defendants
   PERFECTUS ALUMINIUM INC.,
15 aka "Perfectus Aluminum Inc.," and
   PERFECTUS ALUMINUM ACQUISITIONS LLC
16

17                    UNITED STATES DISTRICT COURT

18            CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| 19  UNITED STATES OF AMERICA, | Case No. 19-cr-00282 RGK |
| 20           Plaintiff, | *[Assigned to Hon. R. Gary Klausner, Ctrm. 850]* |
| 21       vs. | |
| 22  ZHONGTIAN LIU,<br>     aka "Liu Zhongtian,"<br>23   aka "Chairman,"<br>     aka "Uncle Liu,"<br>24   aka "UL,"<br>     aka "Big Boss,"<br>25  CHINA ZHONGWANG HOLDINGS LIMITED,<br>26   aka "ZW,"<br>     aka "Mother Ship,"<br>27  ZHAOHUA CHEN,<br>     aka "Chen Zhaohua,"<br>28   aka "Uncle Chen." | **DEFENDANTS' JOINT REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**<br><br>Date:      July 19, 2021<br>Time:     1:30 p.m.<br>Ctrm.:    850<br><br>Trial Date:    August 10, 2021 |

**LARSON**LLP
LOS ANGELES

| | |
|---|---|
| 1 | XIANG CHUN SHAO, |
| | aka "Johnson Shao," |
| 2 | PERFECTUS ALUMINIUM, INC., |
| | aka Perfectus Aluminum Inc.," |
| 3 | PERFECTUS ALUMINUM |
| | ACQUISITIONS, LLC, |
| 4 | SCUDERIA DEVELOPMENT, LLC, |
| | 1001 DOUBLEDAY, LLC, |
| 5 | VON KARMAN - MAIN STREET, |
| | LLC, and |
| 6 | 10681 PRODUCTION AVENUE, LLC, |
| 7 | Defendants. |

## I. THE INDICTMENT DOES NOT ALLEGE A DOMESTIC APPLICATION OF THE WIRE FRAUD STATUTE

None of the reasons set forth in the government's opposition supports the conclusion that the Indictment alleges a domestic application of the wire fraud statute to support a conviction on Counts Two through Ten. In those counts, unlike Count One, the charges are premised solely on an alleged "scheme to defraud investors in defendant China Zhongwang." (Indictment, ¶ 36.) While the government contends that the Indictment charges a *domestic application* of the wire fraud statute, the plain language within the four corners of the Indictment demonstrates that the alleged "scheme to defraud investors in defendant China Zhongwang" is yet another attempt by the government to impermissibly extend the wire fraud statute extraterritorially.

*First*, the government, effectively conceding that the Indictment on its face fails to identify any domestic victim of defendants' alleged "scheme to defraud investors in defendant China Zhongwang" (Indictment, ¶ 36), now seeks to supply extrinsic evidence at this late stage to suggest that there were U.S. investors in defendant China Zhongwang during the relevant period. (Opp. at 11:2-5, n. 5.) This is improper. It is well-established that a "district court is bound by the four corners of the indictment" when "ruling on a pre-trial motion to dismiss an indictment for failure to state an offense." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) (collecting cases). As such, because "[a] motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence," the Court here cannot "consider evidence not appearing on the face of the [I]ndictment." *Id.*; *see also United States v. Lien*, 982 F. Supp. 2d 1184, 1186–87 (E.D. Wash. 2013) (citing *Boren*, 278 F.3d at 914) (declining to consider the government's additional evidence supporting bank fraud not found in the "four corners" of the indictment when determining sufficiency of the indictment). The government's reliance on *United States v. Firtash*, 392 F. Supp. 3d 872, 883 (N.D. Ill. 2019)—a

non-binding district court decision in the Northern District of Illinois—and *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015) is of no consequence, as the Ninth Circuit's *Boren* decision and its progeny are controlling.

**Second**, the government misapprehends the Ninth Circuit's holding in *United States v. Hussain*, 972 F.3d 1138 (9th Cir. 2020), arguing that *Hussain* supports a narrower rule when determining whether an indictment involves a "permissible domestic application" of the wire fraud statute under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). According to the government, all that is required to justify extending the reach of the wire fraud statute extraterritorially is to show that "the conduct relevant to the statute's focus [*i.e.*, the misuse of wires] occurred in the U.S.," irrespective of whether the use of the wires was merely incidental to the alleged scheme to defraud. (Opp. at 10:1-11:9.) The government is wrong. In *Hussain*, the Ninth Circuit recognized that an "additional inquiry may be necessary to ensure a domestic application" of the wire fraud statute, *namely*, whether the "use of domestic wires was merely 'incidental' to the overall scheme" where a "foreign defendant is alleged to have committed wire fraud against a foreign victim." *Hussain*, 972 F.3d at 1144, n. 2. However, because the defendant in *Hussain* defrauded a domestic victim, the court found it unnecessary to address this additional inquiry. *Id*. In sum, nothing in *Hussain* suggests that it is the law of the Ninth Circuit that a district court cannot inquire into whether the use of wires was "merely incidental" to the alleged scheme to defraud when foreign conduct is involved. Indeed, the government's suggestion that this is a "theoretical exception" is at odds with Supreme Court precedent. *See WesternGeco LLC v. ION Geophysical Corp*., 138 S. Ct. 2129, 2138 (2018) (conduct *merely incidental* to a cause of action is not sufficient to establish "primacy" for purposes of the extraterritoriality analysis); *Morrison*, 561 U.S. at 266 ("[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case.").

***Third***, the government's attempts to equate *Hussain* to the factual allegations in the Indictment are unfounded.  Per the government, the Indictment charges a domestic application of the wire fraud statute because, like *Hussain*, the wire fraud counts involve two emails sent to and from the Central District of California and seven wire transfers of funds from bank accounts located in the United States.  (Opp. at 8:10-14, 9:6-23).  Further, the government repeatedly asserts that, because the Warehouse and Perfectus Defendants are incorporated in the United States, the Indictment is not extraterritorial.  (*Id*. at 10:17-11:2, 12:21-28.)  The Supreme Court's decision in *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021), dated June 17, 2021, contradicts this categorical argument.  In *Nestle*, the court reversed the Ninth Circuit's holding that the plaintiff adequately pled a domestic application of the Alien Tort Statute because Nestle—a United States based company—made financing and other corporate decisions within the United States.  The court held that a plaintiff must allege domestic conduct that is more than "general corporate activity" to justify an extraterritorial application where all of alleged conduct occurred outside the United States and the victims of the alleged conduct were foreign nationals.  Under *Nestle*, the Warehouse and Perfectus Defendants were based in the United States is not sufficient to charge a domestic application of the wire fraud statute.

***Fourth***, the remaining factual allegations relied upon by the government to rebut the presumption against extraterritoriality fare no better.  To demonstrate a domestic application of the substantive wire fraud counts, the government cites to the following allegations: (i) That defendants imported aluminum pallets into the United States; (ii) that defendants stockpiled the aluminum in warehouses in the United States; (iii) that the Perfectus Defendants managed the importation and payments for the aluminum using U.S. based employees; (iv) that a meeting was held at the Irvine Warehouse to discuss ways to avoid the AD/CVD duties; (v) that defendant Liu attempted to build a facility in California to melt the imported

aluminum pallets; and (vi) that defendant Liu transferred and caused the transfer of $200 million into and out of a California bank in connection with defendant China Zhongwang's IPO. (Opp. at 13:1-17.) However, none of these allegations correspond to the nine wires charged in Counts Two through Ten. Instead, these allegations relate to the substantive customs fraud counts (Counts Eleven through Seventeen) and the government's second conspiracy theory that defendants conspired to "defraud the United States" and the CBP by deceitful and dishonest means. The government cannot pick and choose factual allegations that have no bearing on the substantive *wire fraud* counts to establish a domestic application of the *wire fraud* statute.

*Fifth*, the government's argument that the "wires alleged in Counts Two through Ten of the Indictment" were "central to the scheme" to defraud investors in China Zhongwang is disingenuous. It cannot reasonably stand that one email, dated May 13, 2014, sent from China to the United States (Count Two); one other email, dated August 20, 2014, sent from the United States to China (Count Eight); four bank transfers in 2014 sending funds to foreign bank accounts in Hong Kong and China controlled by a foreign entity (Counts Three through Seven); and two bank transfers in 2015 sending funds to a bank account in China controlled by a foreign entity amounted to the "core components" of the scheme to defraud. Rather, the Indictment alleges a "scheme to defraud investors in defendant China Zhongwang" that began "in or about July 2008" and continued to at least May 7, 2019 premised on defendant China Zhongwang's publishing false information in its annual financial reports and other specific disclosures in 2010-2017. (Indictment, ¶¶ 32, OA Nos. 14, 23, 30, 45, 86, 89-91, 93-96.) That the wires charged may have had some minimal relationship to the alleged "scheme to defraud investors" such a *de minimis* potential affect does not justify extending the reach of the wire fraud statute extraterritoriality. The absurdity of this is further exemplified by the fact that the Indictment concedes that defendant China Zhongwang was a billion-dollar

corporation and one of the "largest aluminum extrusion manufacturers" in the world. (*Id*. at ¶¶ 3, 5.) Common sense rebuts the government's position that two emails and seven bank transfers over an eleven year period could materially impact a large multi-national corporation's revenues such that investors might be defrauded.

**Sixth**, in addressing the first step of the *Morrison* analysis, the government relies on the phrase "foreign commerce" in the wire fraud statute to support its contention that, even if the Indictment alleges "a foreign application of the wire fraud statute," the Court should deny defendants' motion because "the wire fraud statute applies extraterritorially." (Opp. at 16:2-14.) The government's position is directly at odds with the Supreme Court's express holding in *Morrison* that a "general reference to foreign commerce … does not defeat the presumption against extraterritoriality." *Morrison*, 561 U.S. at 263. Indeed, the government concedes as such by citing *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014*), rev'd on other grounds*, 136 S. Ct. 2090 (2016) (finding no clear manifestation of congressional intent that the wire fraud statute applies extraterritorially under *Morrison*). Even more, while the government cites *Pasquantino v. United States* for the proposition that Congress did not have only "domestic concerns in mind" when it enacted the wire fraud statute, the government conveniently omits the Supreme Court's admonition that its "interpretation of the wire fraud statute" in *Pasquantino* did "not give it 'extraterritorial effect.'" 544 U.S. 349, 371-72 (2005).

For this reason, the government's reliance on *United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015) is likewise misplaced, as the Third Circuit's conclusion that the wire fraud statute applies extraterritorially was premised solely on *Pasquantino* and contradicted *Morrison*. *See, e.g., United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 102 (D.D.C. 2017) (declining to follow *Georgiou's* conclusion that the wire fraud statute applies extraterritorially because the Third Circuit's reasoning was in direct tension with *Morrison*); *see also Bascunan v.*

*Elsaca*, 927 F.3d 108, 121 (2d Cir. 2019). The Ninth Circuit has yet to affirmatively decide whether the wire fraud statute applies extraterritorially under *Morrison*. *See Hussain*, 972 F.3d at 1143 (declining to address whether § 1343 applies extraterritorially). Until it does, the Court should follow the interpretation of § 1343 in *United States v. Sidorenko*, 102 F. Supp. 3d 1124 (N.D. Cal. 2015). There, the court found no "clear" or "affirmative indication" that the wire fraud statute applied extraterritorially, reasoning that the "mere mention" of the phrase "foreign commerce" alone "does not overcome the presumption against extraterritoriality," especially where, as here, the government failed to point to anything in the text or legislative history of the statute that indicated extraterritorial application. *Sidorenko*, 102 F. Supp. 3d at 1129, n. 7 (citing *Morrison*, 561 U.S. at 265).

In sum, the Indictment constitutes an impermissible attempt by the government to expand the scope of United States securities and criminal laws to police foreign activity, *namely*, the actions of a foreign corporate entity that issued annual reports and specific disclosures to foreign shareholders from its foreign headquarters pursuant to the requirements of a foreign stock exchange. Thus, the substantive wire fraud charges in Counts Two through Ten against the Warehouse and Perfectus Defendants must be dismissed with prejudice.

## II. THE INDICTMENT FAILS TO STATE AN OFFENSE UNDER 18 U.S.C. § 545

The government seeks to focus myopically on the fact that the Indictment need not allege that the aluminum pallets were sold in the United States to state an offense under 18 U.S.C. § 545. Although this is not a separate element of customs fraud, the government misses the point. To establish that defendants "acted willfully and with intend to defraud the United States," the government must demonstrate that defendants ***intended*** to sell the aluminum pallets once imported into the United States to establish the requisite *mens rea* under 18 U.S.C. § 545.

Here, the government alleges the exact opposite, repeatedly alleging that defendants <u>never</u> intended to place the pallets into United States commerce.

"Intent to defraud the United States" under 18 U.S.C. § 545 "means intent to avoid and defeat the United States customs laws," which includes depriving the government of revenue and interfering with or obstructing "one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *United States v. Robinson*, 147 F.3d 851, 854 (9th Cir. 1998); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924). Here, the "United States customs laws" that the Warehouse and Perfectus Defendants are charged with intending to "avoid" and "defeat" are the 2011 AD/CVD Orders. (Indictment, ¶¶ 28, 33(x)-(cc).) Therefore, the government's underlying interest in enforcing the 2011 AD/CVD Orders is determinative with respect to establishing the requisite "intent to defraud the United States" under § 545. Accordingly, the Indictment alleges that the "AD/CVD orders were intended to ensure fair competition between United States companies and foreign industry, and to counter international price discrimination that caused injury to United States domestic industries." (Indictment, ¶ 26.)

It necessarily follows that the governmental interest implicated here would be protecting the domestic aluminum industry from adverse economic impacts that would arise if the aluminum extrusions imported by defendants from China entered the United States market. *See, e.g., Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1047 (Fed. Cir. 2012) (noting countervailing subsidies and antidumping duties are aimed to offset economic distortions caused by foreign companies who seek to undercut domestic producers). Yet, the government asserts that the Perfectus Defendants "never sold the aluminum pallets to end-users, and instead simply hid them in warehouses" owned by the Warehouse Defendants. (Opp. at 5:11-15.) The government further asserts that "there was no market or customers" for the imported aluminum pallets, that defendants "were not selling the

pallets to customers," and that defendant Liu "ordered the aluminum pallets in the … warehouses exported to his company in Vietnam." (*Id*. at 4:15-28, 5:26-27.) These assertions are echoed repeatedly in the Indictment. (Indictment, ¶¶ 33(a)(i)(III), 33(h), 33(r)(iv), 33(u).) In sum, because the government asserts that the defendants never intended to introduce the aluminum pallets into the United States market at the time of importation, the Indictment fails to allege that defendants interfered with a lawful function of the CBP's enforcement of the 2011 AD/CVD Orders as required to establish the requisite "intent to defraud the United States" for purposes of 18 U.S.C. § 545.

Furthermore, the government's reliance on *Perfectus Aluminum, Inc. v. United States*, 836 F. App'x 883 (Fed. Cir. 2020) is both improper and misplaced. In ruling on a motion to dismiss an indictment for failure to state an offense, a district court "cannot consider evidence not appearing on the face of the indictment" and is "bound by the four corners of the indictment." *Boren*, 278 F.3d at 914. The government, therefore, cannot establish that the aluminum pallets were subject to the 2011 AD/CVD Orders by bringing in extrinsic evidence of the Federal Court's decision relating to the Perfectus Defendants' litigation on this issue, especially when the decision, dated November 6, 2020, was issued considerably after the Indictment was filed on May 7, 2019 and *several years* after the dates of the specific conduct charged in the Indictment. In any event, *Perfectus Aluminum, Inc. v. United States* further undermines the sufficiency of the Indictment. In addition to showing an "intent to defraud the United States," section 545 also requires that defendants "knowingly" passed papers through a customhouse of the United States and that defendants "knew" that the papers were false, forged, or fraudulent. *See* Model Crim. Jury Instr. 9th Cir. 8.36 (2021). The Indictment alleges that defendants "knowingly, willfully, and with intend to defraud the United States" violated 18 U.S.C. § 545 when defendant Shao caused PCA's customs broker to submit to Customs a Form 7501 for the importation of the aluminum pallets on May, 19,

2014, May 22, 2014, May 23, 2014, May 28, 2014, May 30, 2014, June 6, 2014 and June 27, 2014. (Indictment, ¶¶ 40, OA Nos. 49-55, 57.) However, as *Perfectus Aluminum, Inc. v. United States* demonstrates, whether the aluminum pallets imported by defendants fell within the scope of the 2011 AD/CVD Orders had yet to be determined in 2014. Indeed, the Department of Commerce—at the request of the Aluminum Extrusions Fair Trade Committee—did not issue its scope ruling that the aluminum pallets were subject to the 2011 AD/CVD Orders until June 13, 2017. *See Perfectus Aluminum, Inc. v. United States*, 391 F. Supp. 3d 1341, 1347 (Ct. Int'l Trade 2019). This wholly negates the allegations in the Indictment that defendants "knew" that the aluminum pallets were subject to the 2011 AD/CVD Orders when PCA's customs broker submitted the charged forms. Indeed, the Indictment alleges only that "certain" aluminum extrusions were subject to the 2011 AD/CVD Orders. (Indictment, ¶ 28.)

*United States v. Murphy*, 809 F.2d 1427, 1431 (9th Cir. 1987) is instructive. In *Murphy*, the indictment alleged that the defendants falsely identified the source of the deposited funds on Form 4789 that was filed with the IRS. The court, however, held that the indictment failed to allege a conspiracy to defraud the IRS, reasoning that, while the defendants intent "may, indeed, have been evil," Form 4789 was subject to different interpretations, and the conduct had not yet been denounced as crime. *Id*. Here, the Indictment fails to allege a violation of section 545 because, similar to *Murphy*, when the forms (Form 7501) were submitted to the CBP in 2014, the 2011 AD/CVD Orders were subject to varying interpretations with respect to whether aluminum "pallets" fell within the scope of the orders. Accordingly, Counts Eleven through Seventeen must be dismissed as to the Warehouse Defendants and the Perfectus Defendants with prejudice.

### III. CONSPIRACY

Despite moving to dismiss the Indictment *in its entirety*, the government contends that the Warehouse and Perfectus Defendants "do not challenge the

conspiracy to defraud the U.S. charged in Count One." (Opp. at 7:10-11.) To support this disjunctive argument, the government posits that Count One of the Indictment alleges that defendants "conspired (i) to defraud the United States and (ii) to commit substantive offenses. (*Id*. at 18:18-21.) While it is be true that 18 U.S.C. § 371, by its terms, criminalizes a conspiracy to "either" commit "any offense against the United States" or "to defraud the United States, or any agency thereof," the Indictment on its face does not charge a separate conspiracy "to defraud the United States" that is in any way distinguishable from the allegations of customs fraud supporting Counts Eleven through Seventeen.[1]

To illustrate, under § 371, "defraud the United States" means to "impede, impair, obstruct, or defeat the lawful function" of any department of government. *United States v. Rodman*, 776 F.3d 638, 642 (9th Cir. 2015). This is effectively the same as the "intent to defraud the United States" element under 18 U.S.C. § 545. Thus, the conspiracy to "defraud the United States" by "impeding, impairing, obstructing, and defeating the lawful functions" of the CBP by "deceitful and dishonest means" alleged in Count One of the Indictment is effectively the same as, if not identical to, the customs fraud counts—Counts Eleven through Seventeen. Accordingly, because the substantive customs fraud counts fail, Count One based on a conspiracy to "defraud the United States" likewise should be dismissed.

---

[1] Count One also fails under the "any offense" clause of § 371. As the government concedes in footnote 4, the conspiracy to commit wire fraud alleged in Count One must be dismissed if the substantive counts amount to an extraterritorial application of the statute, which they do. Likewise, because the Indictment fails on the substantive customs fraud counts, the alleged conspiracy to commit violations of 18 U.S.C. § 545 in support of Count One also fails. The same is true with respect to the conspiracy to commit international promotional money laundering because, as the government further concedes, these charges "rely on the viability of the wire fraud and customs fraud charges." (Opp. at 7-8, n. 3, 4.)

| | | |
|---|---|---|
| Dated: July 2, 2021 | | LARSON LLP |

By:   /s/ *Stephen G. Larson*
     Stephen G. Larson
     Hilary Potashner
     A. Alexander Lowder

Attorneys for Defendants
SCUDERIA DEVELOPMENT, LLC,
1001 DOUBLEDAY, LLC,
VON KARMAN - MAIN STREET, LLC, and
10681 PRODUCTION AVENUE, LLC

Dated: July 2, 2021          RUYAKCHERIAN LLP

By:   /s/ *Robert F. Ruyak*
     Robert F. Ruyak

Attorneys for Defendants PERFECTUS ALUMINUM INC. and PERFECTUS ALUMINUM ACQUISITIONS LLC